AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT FILED

for the

Eastern District of California

AUG 28 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

| In the Matter of the Search of | ) |
| :--- | :--- |
| | ) |
| Information associated with data and derivative work products described in Attachment A that are stored at premises controlled by the California Attorney General's Office | ) |
| | ) |

Case No. **2:17 - SW - 0764 KJN**

## SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| :--- | :--- |
| 18 U.S.C. § 1952(a) | Interstate and foreign travel or transportation in aid of racketeering enterprises |
| 18 U.S.C. § 1956(h) | Conspiracy to launder monetary instruments |
| 18 U.S.C. § 1956(a)(1)(A)(i) | Laundering of monetary instruments |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Richard Robinson, Special Agent, IRS-CID
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Aug 28, 2017

_____
*Judge's signature*

City and state: Sacramento, California

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

1  IN THE MATTER OF THE SEARCH OF:

2  INFORMATION ASSOCIATED WITH DATA AND DERIVATIVE

3  WORK PRODUCTS DESCRIBED IN ATTACHMENT A

4  ALL STORED AT:

5  CALIFORNIA ATTORNEY GENERAL'S OFFICE

6  1300 I STREET, SACRAMENTO, CALIFORNIA 95814

7

8  **AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

9       I, Richard Robinson, being duly sworn, depose and state as follows:

10                                      **INTRODUCTION**

11       1.       I am a Special Agent with Internal Revenue Service – Criminal Investigation Division

12  (IRS-CID). I have been assigned to the Phoenix Field Office IRS-CID for 13 years, and during that time

13  have conducted a variety of investigations into criminal tax violations, financial fraud schemes and

14  money laundering violations.

15       2.       I make this affidavit in support of an application for a search warrant for the data,

16  derivative work product and associated records described in Attachment A, which are stored at the

17  California Attorney General's Office, 1300 I Street, Sacramento, California, 95814.

18       3.       I have probable cause to believe that evidence, fruits and/or instrumentalities of

19  violations of 18 U.S.C. §§ 1952(a), 1956(a)(l)(A)(i) and 1956(h) is located within the data described in

20  Attachment A, which is attached hereto and incorporated by reference. I have reason to believe that the

21  aforementioned data, derivative work product and associated records that are the subject of the instant

22  application will detail and assist in identifying transactions for the purchase of "adult" advertisements

23  from Backpage.com ("Backpage"). I also have reason to believe that those advertisements promoted

24  illegal activity within and outside the borders of the United States, and that the owners and officers of

25  Backpage sold the advertisements knowing that they promoted illegal activity. Thus, as outlined below,

26  and based on my training and experience, there is probable cause to believe that evidence, fruits and/or

27  instrumentalities of the aforementioned crimes, as further described in Attachment B, which is attached

28  hereto and incorporated by reference, are located or recorded in that data.

1    4.    I am familiar with the information contained in this Affidavit based upon the
2  investigation I have conducted, along with my conversations with law enforcement officers and others
3  and review of reports, grand jury transcripts, agent notes, database records and other public documents.
4  This Affidavit is submitted for the limited purpose of securing a search and seizure warrant.  It does not
5  include each and every fact known to me or the government about the investigation.  I have set forth
6  only those facts that I believe are necessary to establish probable cause.

7                                **STATUTORY AUTHORITY**

8    5.    The "Travel Act," pursuant to 18 U.S.C. § 1952(a), prohibits, in part, the use of the mail
9  or any facility in interstate or foreign commerce with the intent to otherwise promote, manage, establish,
10  carry on, or facilitate the promotion, management, establishment or carrying on of any unlawful activity,
11  and thereafter performs or attempts to perform an act to promote, manage, establish, carry on or
12  facilitate the promotion, management, establishment and carrying on of such unlawful activity.

13    6.    "Unlawful activity," as defined in 18 U.S.C. § 1952(b), includes prostitution offenses in
14  violation of the laws of the State in which they are committed or of the United States.  Prostitution is
15  illegal in the State of California.  (*See, e.g.*, Cal. Penal Code § 647(b).)

16    7.    Title 18, United States Code, Section 1956(h) prohibits a conspiracy to commit money
17  laundering, and the prosecution is obliged to establish that: (1) an agreement to commit money
18  laundering existed between one or more persons; (2) the defendant knew that the money laundering
19  proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily
20  became part of the conspiracy.

21    8.    Title 18, United States Code, Section § 1956(a)(l)(A)(i) prohibits what the case law calls
22  "Promotional Money Laundering."  Specifically, Section 1956(a) prohibits the following: (a)(l )
23  "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some
24  form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact
25  involves the proceeds of specified unlawful activity -- (A)(i) with the intent to promote the carrying on
26  of specified unlawful activity."  "Financial transaction" is defined under 18 U.S.C. § 1956(a)(l) as
27  follows: "a financial transaction shall be considered to be one involving the proceeds of specified
28  unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the

1   proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement."

2        9.     The investigation shows that many, if not most, of the paid advertisements on the

3   Backpage website are for prostitution activities in violation of 18 U.S.C. § 1952.  Furthermore, the

4   investigation indicates that many, if not most, of the individuals advertising those services have no other

5   legitimate source of income, and, accordingly, that much, if not most, of the money used to pay for those

6   advertisements is derived from illegal prostitution activity in violation of 18 U.S.C. § 1952.

7        10.    The investigation also shows there is probable cause that James Larkin and Michael

8   Lacey are the true beneficial owners of Backpage, and that Carl Ferrer, Larkin, Lacey, Andrew Padilla,

9   and other officers and employees of Backpage know that much, if not most, of the money Backpage

10  receives for such paid advertisements represents proceeds from illegal activities.  Similarly, the

11  investigation shows that the monies paid for the advertisements are used to facilitate illegal prostitution

12  and to perpetuate Backpage's business by, among other things, paying moderation employees to sanitize

13  the submission of advertisements, maintaining the servers used to promote Backpage's Adult internet

14  site, paying managers and other employees, maintaining a headquarters, and paying the owners of the

15  website.  In sum, as detailed below, there is probable cause that Ferrer, Larkin, Lacey, Andrew Padilla,

16  and other officers and employees of Backpage are engaging in promotional money laundering and

17  conspiracy to commit promotional money laundering.

18                  **PROSTITUTION AND SEX TRAFFICKING ON THE INTERNET**

19       11.    Based on my training and experience, as well as that of my fellow investigating law

20  enforcement officers, I know that the internet has transformed the commercial sex trade.

21       12.    Prior to the rise of the internet, commercial sex took place on the streets, at casinos, truck

22  stops, and other physical locations.

23       13.    With the internet, individuals involved in advertising commercial sex now post

24  advertisements online on various websites, including classified ad websites.  Such online sites facilitate

25  the commercial sex trade by providing an easily accessible forum that matches buyers of sex with the

26  individuals providing sex ads for a fee.  The individuals providing sex acts for a fee include minor and

27  adult victims of sex trafficking and adult individuals voluntarily engaging in prostitution.

28  ///

1 **UNDERLYING INVESTIGATION INTO BACKPAGE.COM**

2     14.    Backpage is a company that provides online classified advertising at the website

3 www.Backpage.com and other sites.  Backpage can be accessed throughout the United States and in

4 foreign countries.  It was created around 2004.

5     15.    Backpage has offices and employees in Phoenix, Arizona, and Dallas, Texas.  Carl Ferrer

6 is the CEO of Backpage, and remains active within Backpage to this day.

7     16.    Beginning in 2004, Backpage was owned by a parent company called New Times Media

8 ("NTM"), later called Village Voice Media ("VVM").  In September 2012, Lacey and Larkin decided to

9 sell other holdings within VVM and retain ownership of Backpage.

10     17.    Backpage allows users to post classified ads under numerous categories including, among

11 others, automotive, buy/sell/trade, jobs, real estate for sale, rentals, and adult entertainment.  The ads are

12 categorized by location, allowing a user to decide the city and country to post ads in or to browse.

13 Numerous cities throughout the United States are provided, along with cities in foreign countries.

14     18.    The adult entertainment section is broken up into different categories, including  "adult

15 Jobs," " body rubs, " "domination & fetish," "escorts," "male escorts," "phone & websites,"

16 "strippers/strip clubs," and "transsexual escorts."

17     19.    Backpage had an adult section offering "services" and "body rubs" starting in 2004.

18 Backpage had an "escorts" section starting as early as 2006.

19     20.    Beginning in 2010, Backpage began making large profits per year for ads posted in the

20 Escorts section of the site after its competitor, Craigslist, shut down its own adult services section.

21 Craigslist was an online classified ad site similar to Backpage.  Craigslist faced public pressure from

22 numerous state attorneys general to shut down its adult services section because it was commonly linked

23 to sex trafficking and prostitution.  Once Craigslist shut down its adult services section, Backpage began

24 to see a spike in the Escort Ads posted on its site, along with a spike in profits.  In 2011, alone,

25 Backpage began making more than $30 million a year.

26     21.    In January 2017, Backpage closed its adult advertising section in the United States,

27 asserting years of government pressure left it no choice but to shutter its most popular and lucrative

28 feature.  The decision came shortly after a U.S. Senate panel released a report alleging Backpage

1  concealed criminal activity by removing words from ads that would have exposed child sex trafficking

2  and prostitution.

## LAW ENFORCEMENT INVESTIGATIONS INVOLVING

## SEX TRAFFICKING AND PROSTITUTION

5       22.     Ads posted within the Escort Section of Backpage are routinely tied to sex trafficking and

6  prostitution crimes.  For the past seven years, law enforcement at the local, state, and federal level have

7  repeatedly investigated and charged pimps and other individuals in connection with adult and child sex

8  trafficking on Backpage.  Within the FBI Phoenix field office alone, numerous defendants have been

9  charged and convicted of sex trafficking and other prostitution offenses involving Backpage.

10       23.     The charging and prosecution of pimps and other traffickers who utilize Backpage are

11  largely publicized.  A review of the FBI's website alone reveals over 200 press releases specifically

12  mentioning Backpage in connection with individuals charged and/or convicted of sex trafficking and

13  other prostitution related offenses.

14       24.     Over the past several years, law enforcement has been involved in operations targeting

15  the customers of commercial sex on Backpage (commonly referred to as "Johns").  Law enforcement

16  has posted numerous undercover ads in the Escort Section as thinly veiled advertisements for

17  prostitution.  Hundreds of Johns have been arrested in the process.

18       25.     Operations targeting Johns on Backpage have also been widely publicized.  For example,

19  in "Operation Flush the Johns," law enforcement in Nassau County, New York, posted undercover

20  prostitution advertisements on Backpage from April 18, 2013, to May 24, 2013.  The ads included a

21  fictitious woman known as "Amber," age "27," in scantily clad photographs claiming to be "the girl next

22  door," who is "420 friendly" (slang for marijuana use), and "very open minded."  After reviewing the

23  ads, the customers arranged to meet the fictitious individuals advertised.  Each meeting was captured on

24  hidden cameras where Johns agreed to pay undercover female agents between $50 and $100 for sex acts.

25  As a result of the operation, 104 Johns were arrested.  (See http://www.nydailynews.com/new-york/104-

26  johns-nabbed-nassau-county-pay-sex- article-1.1361717).

27       26.     A similar operation was conducted throughout the country in 2014, in an operation

28  dubbed "National Day of Johns Arrests."  Undercover Escort Ads were posted on sites including

1  Backpage, resulting in the arrests of 496 Johns.  The operation involved law enforcement in Arizona,
2  Colorado, Illinois, Massachusetts, Minnesota, Nevada, North Dakota, Ohio, Oregon, Pennsylvania,
3  South Carolina, Texas, Virginia and Washington.  A Time Magazine article noted, "Of the 150 johns
4  arrested in the Greater Phoenix area, 91 were trying to buy sex off the website Backpage.com." (See
5  http://time.com/3083244/sex-trafficking-prostitution-national-day-of-johns-arrests).

**CALIFORNIA DEPARTMENT  OF JUSTICE UNDERCOVER**

**INVESTIGATION INTO BACKPAGE.COM**

UNDERCOVER AD PLACEMENT OPERATION

9       27.       I am aware of an undercover operation conducted in California targeting Backpage's
10  facilitation of prostitution by posting ads.  In March 2015, California Department of Justice ("California
11  DOJ") Special Agent ("SA") Tera Mackey and SA Brian Fichtner began an undercover investigation
12  into Backpage.com.  SA Mackey was assigned to the California DOJ Sexual Predator Apprehension
13  Team in 2001.  Her duties included the investigation of the sexual exploitation of children, which often
14  involves the use of the internet.  SA Mackey is currently assigned to the California DOJ eCrime Unit,
15  where she engages in investigative work for crimes committed on the internet.  SA Brian Fichtner has
16  been a member of the eCrime unit and has received extensive training on computer related crimes since
17  2012.  Prior to being assigned to the eCrime unit, he was with the Bureau of Narcotic Enforcement for
18  12 years.

19       28.       On March 6, 2015, SA Fichtner posted two fictitious undercover ads in the Sacramento
20  region of Backpage.  One ad offered adult companionship for money in the Escort Section and the other
21  ads listed a sofa for sale in the "Buy, Sell, Trade" section.  In both ads, SA Fichtner used the same
22  account information - a state funded credit card to pay Backpage.com to post the ad, an undercover cell
23  phone number and the email address katiecatt19@gmail.com.

24       29.       To post the Escort ad, SA Fichtner went to the Backpage homepage.  The first page
25  displayed eleven (11) sections with sub-categories; for instance, the "Adult" section contains the
26  "Escort" sub-category and users can click directly on the Escort category from the homepage.  At the top
27  of the page, there was a "Post Ad" link.  He clicked on this link and it displayed a page that listed eleven
28  (11) sections similar to the homepage.  He clicked on the category of "Escorts" and a page was displayed

6

1 | with "Posting Rules." After clicking a button at the bottom of the page, he continued the posting

2 | process.

3 |      30.     The next page displayed a blank template for entering the title, description, age, location,

4 | email address, and photos or videos for the ad. Backpage listed a fee of $10 for the Escort category.

5 | Toward the bottom of the page, upgrades to the ad were offered for additional fees. Upgrades included

6 | automatically reposting the ad to the top of the page or highlighting the ad with a "thumbnail." Users

7 | could pay anywhere from $40 to repost an ad several times a day, to $960 to repost an ad 104 times a

8 | day.

9 |      31.     To draft the fictitious ads, SA Fichtner used Backpage ads reviewed during the

10 | investigation as templates. He included a photograph of a woman dressed in lingerie who described

11 | herself as "clean, safe, and 100% independent" and offered to make users' "dreams come true,"

12 | mentioning an hourly rate of $175. Once the template was completed, he clicked on the "Continue"

13 | button at the bottom of the page; next to the "Continue" button was the statement, "By placing this ad I

14 | agree to the terms of use and privacy policy." He then clicked on the linked terms and policy.

15 |      32.     SA Fichtner continued to the next page of the process where he displayed a preview of

16 | his advertisement and listed the cost of $111.20 to post the ad; he paid to auto-repost eight (8) times and

17 | $21.20 for a Sponsored ad thumbnail on the side banner. At about 8:52 am, he clicked on the "Post Ad

18 | Now" button and was forwarded to the payment page requesting payment by credit card or Bitcoin. He

19 | paid with a credit card utilizing state-provided funds. Below the "Submit" payment button, there was a

20 | message stating, "The charge will appear on your statement as: BP NATIONAL, Payment Solutions

21 | BV., Stawinskylaam 601, 1077XX, Amsterdam, Netherlands." After clicking on the "Submit" button,

22 | he received a "Thank you" message.

23 |      33.     Immediately after posting the ad, an email was sent on behalf of

24 | sacramento.backpage.com to the email address SA Fichtner provided when posting the ad. The email

25 | thanked SA Fichtner for posting the ad and explained that the ad was "Pending" and "will be released

26 | soon." The email noted the posting date, the expiration date, and the cost of the ad. The ad was posted

27 | on Backpage at about 9:00 am.

28 |      34.     SA Fichtner went through a similar process to post the non-Adult ad – a couch for sale in

1  the "Buy, Sell, Trade" section on Backpage.com; there was no minimum fee required for the non-Adult

2  ad, but he paid $1.22 to promote the ad via a Sponsored side banner thumbnail, as well as 26 auto-

3  reposts.

4        35.     SA Mackey was assigned to monitor and document all calls and texts sent to the

5  undercover cell phone used in the ads.

6        36.     Within minutes of the Escort Ad going live, SA Mackey began receiving calls and texts.

7  Between the 6th and 16th of March 2015, SA Mackey received approximately 197 text messages and

8  134 phone calls inquiring about the Escort Ad. SA Mackey received one text message inquiring as to

9  the availability of the couch.

10       37.     While working in her undercover capacity, SA Mackey communicated with several of the

11  potential customers tied to the escort ad, sending and receiving a total of 747 text messages. Many

12  potential customers used terms in their messages and phone calls commonly seen in the commercial sex

13  context. Based on my training and experience, along with the training and experience of SA Mackey

14  and SA Fichtner, the terms used by the customers' in their messages was understood as follows:

15          a. Incalls and/or Outcalls: An "incall" is where the customer comes to the "escort's"

16  location and an "outcall" is where the escort goes to the customer's location. Many users asked SA

17  Mackey about her incall/outcall policy.

18          b. Donation: "Donation" in the "escort" context means the fee an escort would charge for

19  sex acts; in researching commercial sex cases, particularly those on Backpage.com, both prostitutes and

20  customers seem to believe that by saying "donation" rather than fee, they are protected from possible

21  criminal charges.

22          c. BBBJ: "Bare Back Blow Job" - Fellatio without a condom.

23          d. FS: "Full Services" - Sexual intercourse to completion

24          e. GFE: "Girlfriend Experience" - a session that is more like lovemaking with a

25  girlfriend than a commercial service.

26          f. Greek: anal sexual intercourse

27       38.     Included with the 747 text messages that were sent and received, SA Mackey received

28  one video, via text message, of an adult male having intercourse with a "blow up doll" and photographs

1  of two potential customers' faces.

2  39.  Based on the number of phone calls and text messages, I infer that a large number of

3  individuals viewed the ad posted as a prostitution ad. Because numerous individuals viewed the ads as

4  prostitution ads, there is probable cause to believe that Backpage knows that these types of ads are

5  indeed for prostitution.

6  CORRESPONDENCE WITH BACKPAGE OFFICIALS

7  40.  On March 16, 2015, SA Fichtner called Backpage to notify them of the prostitution

8  related ad. SA Fichtner called Elizabeth McDougall, an attorney for Backpage, and left a voicemail

9  with her identifying himself as an agent with the California DOJ, and explaining that he wanted

10  Backpage to remove a known prostitution ad in the Escort Section. SA Fichtner left his cell phone

11  number.

12  41.  On March 16, 2015, SA Fichtner also called Carl Ferrer, the CEO of Backpage. SA

13  Fichtner reached Carl Ferrer and identified himself and asked him about removing a known prostitution

14  ad. Carl Ferrer initially told him to report the ad by email to abuse@backpage.com, but then asked for

15  the ad's details. SA Fichtner provided the Post ID for the ad. Ferrer seemed to be looking up the ad on a

16  computer stating, "the other ads from this user don't appear to be illegal." Ferrer was able to link the

17  Escort ad to the non-Adult couch ad. Ferrer said that he would personally report the prostitution ad and

18  "lock it out." The ad was in fact removed by Backpage thereafter.

19  42.  Carl Ferrer also communicated with agents Fichtner and Mackey via the email account

20  carl.ferrer@backpage.com regarding requests to preserve various Backpage ads agents believed to be

21  indicative of prostitution.

22  43.  On March 17, 2015, Elizabeth McDougall, an attorney for Backpage, called SA Fichtner.

23  SA Fichtner told her he had spoken with Carl Ferrer and that he had removed the ad. McDougall asked

24  how SA Fichtner knew the ad was for prostitution. SA Fichtner said he could not provide details of his

25  investigation. SA Fichtner mentioned that he had seen numerous other ads on Backpage that seemed to

26  be for prostitution and asked why they were not being removed. McDougall said that Backpage does

27  not restrict a users' First Amendment right to post ads. She said Backpage has a filtering process in

28  place to prevent the posting of illegal ads. McDougall explained Backpage's four step filtering process.

9

1   First, ads are screened by a computer program that looks for flagged terms. If the ad passes the

2   computer screening, it is then screened twice by a human moderator - once before it gets posted and

3   again after it is posted. The final level of filtering comes from the public, who can report an ad directly

4   to Backpage via a link on the site.

5       44.   SA Fichtner said he noticed several photos in the Escort Section showing breasts and

6   genitalia. SA Fichtner asked McDougall if there are restrictions on the types of photos that can be

7   posted. McDougall said photos of that nature are not allowed and should not make it through the

8   filtering process. She said if those types of photos are making it through the filtering process, then

9   Backpage would need to identify the moderator who screened the ad and correct the problem.

10      45.   SA Fichtner asked McDougall to explain why the Escort Section charged a significantly

11  higher fee than any other section on the website. She said the higher cost to post adult Escort Ads was a

12  recommendation that had been made to Craigslist.com by the Attorney General to deter criminals from

13  posting illegal ads, and that Backpage followed suit. McDougall stated that Backpage works closely

14  with law enforcement.

15      46.   SA Fichtner reiterated that many Backpage ads appear to be blatant prostitution ads.

16  McDougall did not dissuade him from this impression, and returned to her point about the First

17  Amendment. She said that the internet and prostitution were not going away and if Backpage were to

18  restrict postings of Adult services on their website, it would only drive the industry underground,

19  making it more difficult for law enforcement to investigate.

20                  SEARCH WARRANTS FOR E-MAIL ACCOUNTS

21      47.   Beginning in July 2015, California DOJ obtained search warrants to search the email

22  accounts of Backpage executives and officers, among others, in the California Superior Court in Placer

23  County. California DOJ obtained search warrant returns for the email accounts from Google.

24      48.   As part of its investigation, California DOJ reviewed an email sent from Mariel Lubeck

25  to Jim.Larkin@villagevoicemedia.com, and Michael.Lacey@villagevoicemedia.com. The email's

26  subject read "Conference call this week Confidential." From California DOJ's review of Ferrer's emails,

27  as well as corporate records, it learned that Ferrer regularly reports to an apparent Board of Directors.

28  For example, in January 2014, Ferrer sent an email to members of the board, including Larkin, about an

10

1 upcoming meeting they all appeared to be attending.  Ferrer attached a file named

2 "Agendasjan_2014_PHXBD," which California DOJ believed meant Phoenix Board.  Among other

3 items, the agenda stated that some payment processors were "out because of pot and guns," which I

4 believe refers to the "Sporting Equipment" and "Farm" sections on Backpage.com that often feature pot

5 and guns for sale.  The agenda also mentioned improving the "UX" or user experience by removing

6 "state and name from credit card form," and stopping "pre-pub moderation in CA."  The agenda also

7 stated that to "compete with free you have to be easier and more anonymous," and mentioned allowing

8 "users to post without an email address" and only storing an IP address.  This evidence supports my

9 belief that Ferrer and Backpage staff know that Backpage is used for commercial sex and that Ferrer and

10 Backpage intentionally further that criminal activity by helping users remain anonymous.  California

11 DOJ's investigation also revealed that starting in 2010, Lacey and Larkin used their VVM email

12 addresses (Jim.Larkin@villagevoicemedia.com, and Michael.Lacey@villagevoicemedia.com) to

13 communicate with the National Center for Missing and Exploited Children about measures Backpage

14 could adopt to curb child sex trafficking on its site.

15    49.    California DOJ employees also reviewed a number of e-mail messages and documents

16 dealing with how Backpage processed payments.

17    50.    As most of Backpage's revenue is derived from advertising "adult" services, Backpage

18 was considered to be a part of what the credit card industry considers to be a high-risk industry.  Adult

19 services merchants and their partners are subject to increased reputational risk and are also subject to

20 increased payment risk, or a risk that a customer may initiate fraudulent chargebacks.  A July 6, 2013 e-

21 mail message sent by Carl Ferrer stated that all Backpage credit card transactions were then being

22 processed by Litle & Co, LLC (a Massachusetts-based company specializing in card-not-present online

23 transactions.)

24    51.    On August 27, 2013, Carl Ferrer prepared an internal operations document titled

25 "Alternative Payment Page option," in which he stated that "banks and card companies prevent

26 consumers from posting on our sites by banning transactions from Backpage."  Ferrer identified JP

27 Morgan Chase as an issuer that had blocked transactions originating from Backpage, saying "we

28 documented 17 cases in the past few days where Chase told customers they don't like Backpage and the

11

1 | transactions are blocked."

2 |     52.    On September 2, 2013, Ferrer updated the "Alternative Payment Page option" document,

3 | noting that Backpage's credit card transaction approval rates had dropped to 67% at Litle & Co.  Ferrer

4 | suggested sending "declines with DO NOT HONOR error codes or generic decline error[s] from Litle"

5 | to a second processor, eMerchantPay Limited, a third-party payment processor based in the United

6 | Kingdom.

7 |     53.    On September 30, 2013, Backpage executed a three-way agreement between their U.K.-

8 | based entity Classified Solutions, Ltd., eMerchantPay Limited and Borgun hf, a financial institution and

9 | credit card transaction acquirer based in Iceland.  That agreement identified Classified Solutions, Ltd. as

10 | the owner of Backpage and ymas.com, a Spanish-language clone of Backpage.

11 |     54.    In a PowerPoint presentation apparently prepared by Ferrer on about November 4, 2013,

12 | for an executive meeting on November 6, 2013, Ferrer stated that Backpage had begun a process of

13 | identifying credit card numbers likely to be rejected, based on the bank that issued the card, and directed

14 | those transactions to eMerchant Pay, Limited in the U.K.  According to the presentation, as a result of

15 | those actions, transaction approval rates had increased to over 80%.

16 |     55.    Thus, beginning in 2013, Backpage began directing processing of credit card payments

17 | through overseas financial institutions.  By 2015, a substantial portion of Backpage's revenues were

18 | received this way.  Between January and September 2015, Backpage and its sister business entities

19 | received $28 million from related accounts in Iceland and $43 million from related accounts in

20 | Lichtenstein in the form of wire transfers to the U.S.

21 | <u>SEARCH WARRANT FOR AWS TRANSACTIONAL DATA</u>

22 |     56.    In November 2016, Amazon Web Services, Inc. (AWS) provided California DOJ with

23 | two hard disk drives pursuant to a search warrant, along with keys, passwords and hashes necessary to

24 | verify and decrypt the data provided on those drives.  These hard disk drives contained about two

25 | terabytes (TB) of data, including images of the Payment Processing Island (PPI) Servers used by

26 | Backpage to process credit card transactions.  While it was hosted by AWS, the PPI was controlled by

27 | Backpage personnel.

28 |     57.    When a customer attempted to conduct a transaction on Backpage using a credit card,

1  they were redirected to a secure page hosted on an AWS server. PPI server accepts the customer
2  information such as name and account number. This information is then sent to a third-party payment
3  processor and a log is created of the transaction attempt. The log includes such information as the
4  service ordered, the time of the transaction, identification of the bank that issued the credit card and
5  whether the transaction attempt was successful.

6      58.    The transactional data was maintained in a MySQL database, a type of relational database
7  commonly used in online commerce. In his December 22, 2016 report entitled "Preliminary AWS PPI
8  Report – Backpage," Forensic Accountant Bassem Banafa, who periodically did work for California
9  DOJ, described reviewing documents related to Backpage's payment processing infrastructure,
10 including a network diagram and technical specifications.

11     59.    Banafa further described having recovered several transactions into a new recovered
12 MySQL database. I understand from my discussions with personnel at California DOJ, that the
13 recovered MySQL database contains about 500 gigabytes (GB) of data, or perhaps about a quarter of the
14 transactions in the AWS data. Banafa used the recovered MySQL database to identify ads the following
15 Backpage advertising areas or locations in California: Bakersfield, Chico, Fresno, Humboldt, Imperial,
16 Inland Empire, Long Beach, Los Angeles, Mendocino, Merced, Modesto, Monterey, North Bay, Orange
17 County, Eastbay, Palm Springs, Palmdale, Redding, Sacramento, San Diego, San Fernando Valley, SF,
18 San Gabriel Valley, San Jose, San Luis Obispo, San Mateo, Santa Barbara, Santa Cruz, Santa Maria,
19 Siskiyou, Stockton, Susanville, Ventura and Visalia.

20     60.    Using the database and those identified locations, Banafa was then able to create a query
21 to return monthly totals for transactions that were:

22          a. Approved

23          b. In California

24          c. In the Female Escorts Section

25     61.    The total of the transactions responsive to the above query from July 2014 through
26 October 2016 was $44,895,296.28. Using this same data, Banafa was also able to isolate payments by
27 financial institution (*e.g.*, American Express) and by the Backpage-related business entity named in the
28 transaction (*e.g.*, Postfastr, LLC).

## BACKPAGE HAS KNOWLEDGE OF THE ILLEGAL ACTIVITY
## OCCURRING IN ITS ESCORT SECTION

62.     Many groups and individuals have discussed with Backpage the prostitution activity occurring on its Escort Section on multiple occasions. By letter dated September 21, 2010, 21 state Attorneys General informed the then-lawyer for Backpage of the following: "We believe that ads for prostitution, including ads trafficking children, are rampant on the site and that the volume of ads will grow in light of Craigslist's recent decision to eliminate the adult services section of the website." Backpage continued to provide its "Escort" section to the general public. By letter dated August 31, 2011, 45 state Attorneys General sent a letter to Backpage's then counsel discussing various cases the offices were prosecuting where children were trafficked on Backpage. The letter referenced a previous acknowledgement from Carl Ferrer to the Washington State Attorney General's office "that [Backpage] identifies more than 400 'adult services' posts every month that involve minors." (See http://atg.sd.gov/docs/Joint%20AG%20Letter%20to%20Backpage.com.pdf.). Despite repeated warnings about facilitating prostitution, Backpage still continued to provide its "Escort" section to the public.

63.     While continuing to run its "Escort" section, Backpage has been served with civil complaints providing it additional notice of serious allegations involving sex trafficking. For example, in 2010, Backpage was sued in *M.A. ex. rel. P.K. v. Vill. Voice Media Holdings, LLC and Backpage*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011). According to the court papers, a juvenile victim of sex trafficking sued Backpage for her victimization after ads were posted of her on Backpage. Specifically, from 2009 to 2010, Plaintiff M.A., a 14-year-old, was being sexually trafficked by Latasha Jewell McFarland, an adult, who pled guilty in a separate criminal case to using a facility in interstate commerce to promote prostitution pursuant to 18 U.S.C. § 1952(a)(3). Defendant McFarland, while in open court, admitted to photographing M.A., displaying her private body parts in sexual pornographic poses, and posting the child pornography on Backpage as advertisements seeking payment for sex. McFarland further admitted to paying Backpage for these postings, and transporting M.A. for the purposes of multiple sexual liaisons for money with adult male customers obtained through Backpage's website. (*M.A. ex. rel. P.K.*, 801 F. Supp. 2d at 1041-42.)

64.     In seeking to hold Backpage liable, the lawsuit against Backpage alleged the following:

* In 2009 and 2010, [Backpage] posted many advertisements which included explicit nude photographs of Plaintiff, M.A., a minor, advertising her services as an escort for sex on backpage.com and received fees for each posting.

* [Backpage] had knowledge that: explicit sexual pornographic photographs were being posted on its website; that postings on their website were advertisements for prostitution; that numerous minors were included in these postings for prostitution on its website; that sex trafficking of minors is prolific in the United States of America; that the internet, including their website, was used for advertisements for illegal sexual contact with minors; that on numerous prior occasions [Backpage was] made aware of minors being trafficked on their website; that according to [Backpage], on five prior occasions [Backpage] responded to subpoenas involving the trafficking of minors on backpage.com and this does not include other cases involving minors of which [Backpage is] aware wherein [Backpage] cooperated with authorities without subpoenas.

* By posting explicit nude photographs of Plaintiff, M.A., a minor, in an advertisement which advertised her services as an escort for sex on backpage.com, [Backpage] facilitated child sex trafficking and aided and abetted McFarland in violating each criminal statute and United States Treaty Optional Protocol herein alleged, in that: [Backpage] had a strong suspicion that the aforementioned crimes were being committed yet was so indifferent that [it] failed to investigate for fear of what it would learn; [Backpage] had a desire that these posters accomplished their nefarious illegal prostitution activities so that the posters would return to the website and pay for more posting; and [Backpage] continued to maintain their website so as to participate in these illegal transactions . . . . (*Id.* at 1045.)

65.     Backpage, through its lawyers, moved to dismiss the lawsuit and argued immunity under the Communications Decency Act, 47 U.S.C. § 230. After reviewing the allegations and the Communications Decency Act ("CDA"), which serves as a bar for many civil lawsuits and state criminal prosecutions against internet-related entities, the district court dismissed the lawsuit. (*M.A. ex. rel. P.K.*, 801 F. Supp. 2d at 1058.)

66.     In October, 2014, Backpage was again sued by child sex trafficking victims in *Doe ex rel. Roe v. Backpage.com, LLC*, 104 F. Supp. 3d 149, 149-65 (D. Mass. 2015). According to that lawsuit,

1   Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 were juvenile victims of sex trafficking

2   advertised repeatedly on Backpage. Jane Doe No. 1 was first trafficked by pimps on Backpage in

3   February of 2012, when she was 15 years old. She was again sold on Backpage in March of 2013.

4   Between June of 2013 and September 10, 2013, her "services" were advertised on Backpage each and

5   every day. As a result of the ads, she engaged in 10 to 12 sex transactions daily with adult men in

6   Massachusetts and Rhode Island. Her pimp moved her from town to town every two days to avoid

7   detection. Jane Doe No. I appeared in some 300 ads on Backpage and was raped over 1,000 times. (*Id.*

8   at 153.)

9       67.     Backpage listed each ad featuring Jane Doe No. 1 as an offer of "escort" services, a

10  common euphemism for prostitution. According to the district court, the Jane Doe No. 1 ads included

11  known signifiers for child prostitution such as "young," "girl," "fresh," "tiny," "roses," and "party." Jane

12  Doe No. 1's pimp provided a prepaid mobile phone and a prepaid credit card to conceal Jane Doe No. 1's

13  identity when Jane Doe No. 1 placed ads on Backpage at the direction of her pimp. When Jane Doe No.

14  1 attempted to enter her true age (which was under 18) during the purchase of an ad, Backpage would

15  instruct her to enter her age as 18 or older. Photographs of Jane Doe No. 1 (with her facial features

16  obscured, but at least on one occasion displaying a unique tattoo) accompanied all of her ads. (*Id.* at

17  153.)

18      68.     Jane Doe No. 2 was trafficked on Backpage by her pimp during various periods between

19  2010 and 2012, at different locations in Massachusetts. She was first advertised on Backpage when she

20  was 15 years old. Ads featuring Jane Doe No. 2 were posted either by her pimp or an older woman who

21  worked with him (his "bottom"). The ads would appear on Backpage an average of six times per day.

22  Jane Doe No. 2 was given a prepaid mobile phone to answer calls from would-be customers generated

23  by the Backpage ads. As a result of the ads, she was coerced into five to fifteen sex transactions every

24  day. Like the ads of Jane Doe No. 1, those of Jane Doe No. 2 featured her photograph. The ads were

25  placed using a prepaid credit card. Altogether, Jane Doe No. 2 was raped over 900 times while being

26  trafficked by her pimp. (*Id.* at 153.)

27      69.     Jane Doe No. 3 was trafficked on Backpage in December of 2013 by her pimp and one or

28  more of his associates. The Backpage solicitations for the underage Jane Doe No. 3 described her as

1   "new," "sweet," and "playful." As with the other Jane Doe's, the ads were paid for with a prepaid credit

2   card. Jane Doe No. 3 was also given a mobile phone to take calls and texts from customers. She was

3   taken to a hotel in Foxborough, Massachusetts, where she was raped by men who responded to the ads.

4   Photos of Jane Doe No. 3, including one that she had taken of herself, appeared with the ads on

5   Backpage. (*Id.* at 153.)

6       70.     Backpage, through its lawyers, again moved to dismiss the civil complaint pursuant to the

7   CDA. The district court granted the motion to dismiss. (I understand that legislation is currently

8   pending in Congress to amend the CDA to allow cases involving child sex trafficking to go forward.)

9   **UNITED STATES SENATE, PERMANENT SUBCOMMITTEE ON INVESTIGATIONS,**

10  **COMMITTEE ON HOMELAND SECURITY AND GOVERNMENTAL AFFAIRS ("PSI"),**

11  **INVESTIGATION OF BACKPAGE.COM**

12      71.     I am aware of a January 9, 2017, report issued by the United States Senate, Permanent

13  Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs entitled

14  "Backpage.com's Knowing Facilitation of Online Sex Trafficking" ("PSI Report"). The report

15  contained three principal findings. First, Backpage knowingly concealed evidence of criminality by

16  systematically editing its "adult" ads. (PSI Report at 2.) As early as 2006, Backpage executives began

17  instructing moderators to edit the text of adult ads to conceal the true nature of the underlying

18  transaction. (*Id.*) By October 2010, Backpage executives formalized a process of both manual and

19  automated deletion of incriminating words and phrases, primarily through a feature called the "Strip

20  Term From Ad Filter." (*Id.*) At the direction of CEO Carl Ferrer, the company programmed this

21  electronic filter to "strip"—that is, delete—hundreds of words indicative of sex trafficking (including

22  child sex trafficking) or prostitution from ads before their publication. (*Id.*) The terms that Backpage

23  has automatically deleted from ads before publication include "lolita," "teenage," "rape," "young,"

24  "amber alert," "little girl," "teen," "fresh," "innocent," and "school girl." When a user submitted an adult

25  ad containing one of these "stripped" words, Backpage's Strip Term From Ad filter would immediately

26  delete the discrete word and the remainder of the ad would be published. (*Id.*) By Backpage's own

27  internal estimate, by late-2010, the company was editing 70 to 80% of ads in the adult section either

28  manually or automatically. (*Id.*)

17

72.     Second, Backpage knows that it facilitates prostitution and child sex trafficking. In addition to the evidence of systematic editing described above, additional evidence shows that Backpage is aware that its website facilitates prostitution and child sex trafficking. Backpage moderators told the Subcommittee that everyone at the company knew the adult-section ads were for prostitution and that their job was to "put[] lipstick on a pig" by sanitizing them. (PSI Report at 3.)

73.     Third, despite the reported sale of Backpage to an undisclosed foreign company in 2014, the true beneficial owners of the company are Larkin, Lacey, and Ferrer. (*Id.*) Acting through a complex chain of domestic and international shell companies, Lacey and Larkin lent Ferrer over $600 million to purchase Backpage from them. (*Id.*) The Letter of Intent subjects Ferrer to significant restrictions on his management of the company until the loan is repaid. (*Id.* at 48.) Ferrer cannot sell Backpage, assign the loan to another borrower, or even change accountants or outside counsel without approval from Lacey and Larkin. (*Id.*) The sale was conditional on Ferrer providing a "five-year business plan satisfactory to Seller in its sole and absolute discretion," and Ferrer also committed to submit to Lacey and Larkin for approval an annual budget, monthly and quarterly balance sheets, and annual audited financial statements. (*Id.*)

74.     Information I have reviewed from the PSI Reports demonstrates that senior Backpage executives, including Larkin and Lacey, are aware that the site's adult section is used extensively to advertise prostitution and that Backpage knowingly conceals evidence of criminality by systematically editing its ads in its adult service section.

75.     In October 2010, less than a month after Craigslist shut down its Adult advertising section, Andrew Padilla sent an email to Backpage employees, including Adam Padilla, with the subject "New Moderation Standards." (PSI Report, App. 124.) Andrew Padilla states in the email, "Perhaps indefinitely, and certainly over the next four days, we need to intensify our efforts in cleaning Escorts, Body Rubs, Male Escorts and Dom & Fetish. This intensification will come in the form of extra staff and overtime but most importantly in stricter standards for language and images in ads. I'd like to still avoid Deleting ads when possible, but if an ad makes a clear reference to sex for money or an image displays a sex act, don't hesitate deleting it. These are not the types of ads we want on our site at all. In the case of lesser violation, editing should be sufficient. We're still allowing phrases with nuance but if

1   something strikes you as crude or obvious, remove the phrase.  We're still allowing HBO type of nudity

2   but if an images make you think twice, remove the image.  There is zero tolerance for closeups of

3   exposed genitalia."

4       76.     On March 1, 2011, Ernie Allen, National Center for Missing and Exploited Children's

5   ("NCMEC") then President and CEO, met with Larkin and Lacey. Allen's notes summarizing this

6   meeting, produced to the Subcommittee, reflect that when Allen asked about adult prostitution, Lacey

7   "lit into me with vengeance.... He said his company agreed to eliminate underage kids on their site

8   being sold for sex.... However, he said that adult prostitution is none of my business." (PSI Report at

9   36.)

10      77.     On July 28, 2011, Larkin emailed to Ferrer cautioning him against Backpage's

11  moderation practices "being made public." (PSI Report, App. 432.) Larkin states, "we need to stay

12  away from the very idea of 'editing' the posts, as you know." (*Id.*)

13      78.     The PSI Report also lays out how critical these adult ads were to Backpage's business

14  model.  "According to internal documents, Backpage reported that although ads in the adult section

15  represented only 15.5% of total ad volume in 2011, the company generated 93.4% of its average weekly

16  paid ad revenue from adult ads.  Backpage's adult section dwarfed other categories on the site in the

17  number of paid ads, with over 700,000 as of May 2011, compared to just over 3,000 for "Jobs" and 429

18  for "Automotive."  Adult ads also received significantly more page views than the ads in other

19  categories: As of May 2011, ads in the "Jobs" section had approximately 2 million page views and

20  "Automotive" had approximately 580,000.  By contrast, adult ads had over one billion page views, and

21  no other single category had more than 16 million page views." (PSI Report at 44.)

22      79.     Backpage's revenue grew from $29 million in 2010 to $71.2 million in 2012 and to $135

23  million in 2014.  Backpage's net earnings before income tax, debt and amortization in 2014 was 82% of

24  that $135 million gross revenue figure.  (PSI Report at 43-44.)

25      80.     There is probable cause to believe that Backpage knows many prostitution ads were

26  historically purchased with proceeds from prostitution activity (prior to the credit card companies

27  refusing to process such ads).  There is also probable cause to believe that Backpage knows many ads

28  are currently being automatically reposted for a fee or featured as thumbnails for a fee via proceeds from

1  prostitution.  Many ads note that the females are available "24/7," demonstrating that prostitution

2  activity is a full time job for that individual.  Additionally, many prostitution ads have been repeatedly

3  purchased or automatically reposted on a daily basis over the course of weeks and/or months.  Backpage

4  is able to track the number of ads posted, reposted, and featured as thumbnails for any given account

5  holder.  Based on the full time nature of the job described in the advertisements and the frequent use of

6  Backpage by an account holder, there is probable cause to believe that Backpage knows the fees it has

7  collected historically and today come from prostitution-related proceeds.

8  **CONCLUSION**

9      81.    Based on my training and experience, and the facts as set forth in this affidavit, there is

10  probable cause to believe that 18 U.S.C. §§ 1952(a), 1956(a)(1)(A)(i) and 1956(h) have been violated

11  and that data and related documents associated with the data, derivative work product and associated

12  records described in Attachment A will contain and document the fruits, evidence, contraband, and

13  instrumentalities of such violations, as more fully described in Attachment B.

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## REQUEST FOR SEALING

82.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of these applications including the application, Affidavit, and search warrant.  Disclosure of the search warrant materials at this time would seriously jeopardize the ongoing investigation as the subjects of the investigation would not otherwise be aware of the warrants or that their activities are necessarily the subject of an ongoing criminal investigation.  Disclosure at this time would provide the subjects with the opportunity to destroy evidence, change patterns of behavior, notify other confederates, flee or allow confederates to flee.  Further, the investigation in this matter is continuing, and disclosure would likely preclude or impede the agents and investigators working on this matter from investigating new criminal activity or leads.

_____
Special Agent Richard Robinson
Internal Revenue Service – Criminal Investigation Division

Approved as to form:

_____
Nirav K. Desai
Assistant U.S. Attorney

Subscribed and sworn before me this 28th day of August, 2017:

_____
HONORABLE KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

21

**ATTACHMENT A**

**Description of Property to Be Searched**

This warrant relates to the data produced by Amazon Web Services, Inc. pursuant to a search warrant, along with associated documents, correspondence and derivative work product useful in authenticating, accessing and analyzing that data.  This particularly includes:

a.    Any database with data recovered from the Amazon Web Services, Inc. data;

b.    Any documents or notes created or used in the receipt and analysis of that data;

c.    Supporting documents incorporated or referenced in reports created in relation to this data, including the report entitled "Preliminary AWS PPI Report – Backpage" dated December 22, 2016.

The data and documents are stored at the California Attorney General's Office, located at 1300 I Street, Sacramento, California, 95814.

**ATTACHMENT B**

**Items to be Searched and Seized**

Items to be seized by the government:

All information, in whatever form it exists, that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code §§ 1952(a) (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises); 1956(a)(l)(A)(i) (Promotional Money Laundering); and 1956(h) (Conspiracy to Commit Money Laundering), involving Backpage.com, its officers, related websites or business entities, including information pertaining to:

a.   Purchases of advertisements or payment of fees related to advertisements;

b.   Processing of payments received;

c.   Systems implemented for the receipt and processing of payments;

d.   Identifiers and contact data for customers, employees and other parties connected with Backpage.com;

e.   Storage and production of payment and customer data.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| ) | |
| Information associated with data and derivative work products ) | Case No. 2:17 - SW - 0 7 6 4   KJN |
| described in Attachment A that are stored at premises controlled ) | |
| by the California Attorney General's Office ) | SEALED |
| ) | |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____ *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ September 11, 2017 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____

Date and time issued:    Aug 28, 2017    3:00pm

Judge's signature

City and state:     Sacramento, California     Kendall J. Newman, U.S. Magistrate Judge

*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
            Signature of Judge                                              Date

**ATTACHMENT A**

**Description of Property to Be Searched**

This warrant relates to the data produced by Amazon Web Services, Inc. pursuant to a search warrant, along with associated documents, correspondence and derivative work product useful in authenticating, accessing and analyzing that data.  This particularly includes:

a.      Any database with data recovered from the Amazon Web Services, Inc. data;

b.      Any documents or notes created or used in the receipt and analysis of that data;

c.      Supporting documents incorporated or referenced in reports created in relation to this data, including the report entitled "Preliminary AWS PPI Report – Backpage" dated December 22, 2016.

The data and documents are stored at the California Attorney General's Office, located at 1300 I Street, Sacramento, California, 95814.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT B**

**Items to be Searched and Seized**

Items to be seized by the government:

      All information, in whatever form it exists, that constitutes fruits, evidence, and instrumentalities of violations of Title 18, United States Code §§ 1952(a) (Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises); 1956(a)(l)(A)(i) (Promotional Money Laundering); and 1956(h) (Conspiracy to Commit Money Laundering), involving Backpage.com, its officers, related websites or business entities, including information pertaining to:

      a.     Purchases of advertisements or payment of fees related to advertisements;

      b.     Processing of payments received;

      c.     Systems implemented for the receipt and processing of payments;

      d.     Identifiers and contact data for customers, employees and other parties connected with Backpage.com;

      e.     Storage and production of payment and customer data.